S. FRANKLIN BURFORD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Burford v. Commissioner
Docket No. 8330-80.
United States Tax Court
T.C. Memo 1985-68; 1985 Tax Ct. Memo LEXIS 566; 49 T.C.M. (CCH) 755; T.C.M. (RIA) 85068; February 13, 1985. *566 Held: (1) Voluntary establishment of a trust for lifetime benefit of current wife was a taxable gift. Trust was not established under a written agreement between husband and wife to discharge husband's obligation to support wife. Sec. 2516, I.R.C. 1954, not applicable. Fact that divorce decree entered year and half after establishment of the trust made reference to the trust in denying alimony to wife does not prove that husband received full and adequate consideration for establishing the trust. Held Further: (2) Forgiveness of a note from petitioner's former wife to petitioner was not a taxable gift. While the note had value at the time of cancellation it was cancelled as a part of the property settlement between the parties and full and adequate consideration is deemed to have been received therefor. Michael *568 E. Caryl, for the petitioner. Robert J. Kastl, for the respondent. DRENNEN
*2 MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in petitioner's gift tax for the period ending December 31, 1976 in the amount of $73,326.20. The issues for decision are (1) whether petitioner's release and cancellation of a note from petitioner's former wife, Elizabeth, payable to petitioner, in December of 1976, having a balance then due of $117,119.07, was a gift subject to tax under section 2501(a)(1), I.R.C. 1954, [1] and (2) whether a transfer in trust by petitioner for the lifetime benefit of his then wife, Fern, of property having a value of $600,000 in December of 1976 was a gift subject to tax under section 2501(a)(1). A third issue raised in the petition and argued by petitioner in his original but not his reply brief concerning the validity of the notice of deficiency was decided for respondent in Burford v. Commissioner,76 T.C. 96 (1981) and need not be readdressed here. *569 FINDINGS OF FACT The facts agreed to by the parties in the stipulation of facts filed herein are so found. Petitioner, S. Franklin Burford, is a resident of Snowshoe, West Virginia, and resided there at the time he filed his petition with the Tax Court in this matter. Petitioner filed a *3 United States Quarterly Gift Tax Return, Form 709, for the calendar quarter ending December 31, 1976 with the Memphis Service Center, Memphis, Tennessee. Petitioner was a licensed attorney and had taught tax law at Emory University in Atlanta, Georgia, but during the period relevant herein he was in the coal business in West Virginia. Petitioner and Edsel Lucas each owned a 50 percent interest in the stock of Spruce Coal Sales, Inc., which corporation owned 87 percent of the stock of S.S. Joe Burford, Inc. (hereinafter Burford, Inc.) during the period from the mid-1960's to November, 1976. Burford, Inc. had been formed and operated by petitioner's father in the early 1930's and engaged in various businesses such as slag mining, road building, and the trucking business until it became involved in the coal mining business about 1970. During the early 1970's Burford, Inc. mined coal *570 as lessee under a coal lease of rather extensive properties in Randolph County, West Virginia. During this period Lucas was president and petitioner was secretary of Burford, Inc. Spruce Coal Sales was a corporation formed by Lucas and petitioner to take over petitioner's father's business. It was the selling agent for the coal produced by Burford, Inc. In the spring of 1976 petitioner began negotiations with Valley Industries toward Valley Industries entering into a joint venture with Burford, Inc. for the production of coal under Burford, Inc.'s leases. Instead, in November of 1976 petitioner *4 and Lucas sold their interests in Spruce Coal Sales to Valley Industries for approximately $4,300,000 each plus a royalty which could equal that amount. At the closing of that sale in November, 1976, petitioner received a certified check for $4,100,000. Not long thereafter petitioner began negotiations to lease and operate a ski resort, "Snowshoe," located in Pocahontas County, West Virginia. Snowshoe was involved in bankruptcy proceedings in the U.S. District Court for the Southern District of West Virginia at the time. While petitioner took over the operation of Snowshoe *571 almost immediately the details of the lease arrangement were not worked out until later in 1977. In the fall of 1975 petitioner separated from his wife of approximately 20 years, Elizabeth, and commenced negotiation of a divorce and property settlement. Several children had been born of this marriage. By a decree dated December 15, 1975 petitioner and Elizabeth were divorced. The divorce decree ratified, approved and confirmed an Agreement Incident to Divorce dated December 1, 1975 which had been executed by petitioner and Elizabeth, "in settlement of all rights between the parties" insofar as the agreement was not in conflict with the order (or the laws of West Virginia). The agreement was not merged in but survived the final decree in the action. In the negotiation of this agreement the primary items of discussion were petitioner's stock in Spruce Coal Sales, Inc., and a farm of approximately 688 acres which had been the marital residence of petitioner and *5 Elizabeth. The farm was located in Pocahontas County, West Virginia near Snowshoe Ski Resort. It was encumbered by a deed of trust securing a note executed by petitioner payable to the National Bank of Commerce *572 in Charleston, West Virginia in the face amount of $250,000. The farm was purchased in the names of petitioner and Elizabeth, as joint tenants, by deed dated September 9, 1974. The consideration paid was $250,000 and the purchasers assumed an existing mortgage on the property having a balance due of $92,000 at that time. The property was appraised in June 1975 at $370,000. Other improvements on the property made petitioner's total investment in the property as of December 1975, about $406,000. During the negotiations Elizabeth and her attorney were given access to the latest independent audit reports on Spruce Coal Sales and its subsidiary, Burford, Inc. While petitioner and Lucas had received a number of inquiries concerning a possible purchase of the companies' assets, they had received no reasonable and firm offer for the corporations prior to December of 1975. Elizabeth was primarily interested in the farm. Under the terms of the settlement agreement executed by the parties petitioner agreed, among other things, to pay support for the children, to pay Elizabeth the sum of $800,000 in equal annual installments over 11 years "in full and final discharge of all of Husband's *573 obligations to maintain and support wife," and to transfer all of his interest in the farm to Elizabeth in *6 exchange for her assumption of the $250,000 deed of trust to the Bank of Commerce, and her note to petitioner, secured by a second deed of trust on the property, in the amount of $125,000, payable with interest over a 10 year period. Petitioner also signed an option agreement obligating him to re-purchase the farm for $400,000 at any time during the term of the agreement if Elizabeth wanted to sell. Elizabeth made all the payments due on the $125,000 note during the year 1976. When Elizabeth heard about petitioner's sale of his interest in the coal companies and the terms thereof she wrote a letter to petitioner dated October 16, 1976, as follows: "Dear Frank, Now that you have sold the mine and have a substantial change for the better in your financial situation, I would like to ask that you also adjust mine upwards. The farm which was my part of the divorce settlement, and the mortgage on it which is just covered by the monthly check (the mortgage plus the income taxes I must pay) - the farm cannot run itself and break even under the circumstances, because *574 it requires substantial investment in equipment and fencing - which means higher labor costs. I am asking that you turn over to me the second mortgage you now hold. With that extra money each month I can hire a mature, capable and experienced farm manager, who can then make best use of the young man who is presently working here, and who can insure the proper use of the farm equipment in which I have already invested. I request this because I honestly believe the $1,300/month would not be missed by you in your present *7 financial circumstances, and it is absolutely essential to me in order to maintain the status I was granted at the time of the divorce. Sincerely, Betty" Petitioner, after due consideration of Elizabeth's request and his own financial circumstances, and the fact that he and Elizabeth had been married for 20 years and she had been a good mother to their children, concluded that Elizabeth's request was reasonable, and he so advised her. Petitioner instructed his attorney to draw up the necessary papers to cancel the note and release the deed of trust securing same. Petitioner wrote across the top of the note "Paid in full, S. Franklin Burford" and *575 wrote across the bottom of the note "In final settlement of our divorce dispute this note is declared paid in full. S. Franklin Burford." Petitioner's attorney prepared a short release of the deed of trust, which stated in the last clause, "it being my intention to make a gift to Elizabeth S. Burford of the unpaid amount of the note secured by said deed of trust." The quoted language was stricken by petitioner and the language was altered to read "it being my intention to finally settle the divorce dispute between me and said Elizabeth S. Burford." Both the cancelled note and the release signed by petitioner were delivered to Elizabeth. The note had a balance due at that time of $117,199.07. *8 Petitioner met Fern Helen Burford (hereinafter Fern) in the summer of 1975 when they were both in a hospital in Philadelphia for treatment of alcoholism. They were married on December 31, 1975. Realizing that both had severe drinking problems, they consulted doctors and psychiatrists during 1976 but petitioner reacted to the treatments better than did Fern. Petitioner was admitted as a patient at the Palm Beach Institute on February 6, 1977 where he remained until his discharge *576 on March 18, 1977. He was readmitted April 5, 1977 for three more days of treatment as an inpatient. The Palm Beach Institute is an accredited hospital whose principal purpose is the treatment of persons suffering from alcoholism and for drug dependency. It was the opinion of the director of the institute that when he was first admitted to the hospital petitioner was then, and had been for some time prior thereto, suffering from the disease of alcoholism and as a result thereof petitioner was impaired mentally so that he was incapable of exercising certain reasoning powers and prudent judgment with respect to certain matters. Sometime after petitioner became involved with Snowshoe Ski Resort, petitioner was advised that it might help Fern if she felt some security about her finances for the future. In December of 1976 petitioner established an irrevocable trust fund for Fern's benefit and funded it with $600,000. Under the terms *9 of the trust Fern was to receive the net income of the trust for her life and the trustee was authorized to pay to her so much or all of the principal of the trust estate as it may from time to time determine to be in her best interests. Upon *577 Fern's death the trust estate was to be divided among the children of both Fern and petitioner then living. If there were no living beneficiaries of the trust at any time the trust estate was to be distributed to the University of West Virginia Hospital for research in mental health. Petitioner continued to pay Fern's medical and some of her living expenses. Fern and petitioner were divorced in May of 1978 in a contested divorce proceeding. In the final decree of divorce the court commented on the fact that by virtue of the irrevocable trust petitioner had provided Fern with more than alimony and had made her financially independent. Petitioner was not required to pay alimony to Fern. The divorce decree did not incorporate the trust agreement therein. On or about April 1, 1977 petitioner filed a United States Quarterly Gift Tax Return for 1976 [2] on which he reported gifts of 1,000 shares of Valley Industries stock, valued at $7,054.70 each, to each of seven children, and a cash gift of $600,000 to a trust for his wife Fern J. Burford. Both Fern and petitioner signed the consent lines indicating their consent to having gifts made by their spouses to third parties considered *578 as made by each *10 of them. The return did not report a gift made to Elizabeth. Petitioner also filed a quarterly gift tax return for Fern reporting her share of the gifts reported by petitioner under the gift splitting provision of section 2513(a)(1). On March 27, 1980 respondent issued to petitioner the notice of deficiency in gift tax for the year ended December 31, 1976 which is the basis for this proceeding. Respondent increased petitioner's taxable gifts by the $117,199.07 debt forgiveness to Elizabeth and $184,793.46 for gifts that were not eligible for splitting under the provisions of section 2513(a)(1). In his petition filed herein petitioner raised for the first time an issue with respect to the inclusion in petitioner's taxable gifts of the $600,000 transferred to the trust for Fern, and also raised issues with respect to the inclusion in taxable gifts of the $117,199.07 gift to Elizabeth, and the amount of the gifts attributable to Fern on his gift tax return. At the beginning of the trial petitioner conceded that the gifts reported on his return did not *579 qualify for gift splitting under section 2513(a)(1). Petitioner also claimed that since the total value of his gifts are being taxed to him he is entitled to a refund of the gift tax he paid with Fern's separate return reporting her share of the split gifts. *11 OPINION $600,000 Trust for the Benefit of Fern
The first issue we will address is whether petitioner's transfer of $600,000 in trust for the benefit of Fern in December of 1976 was a taxable gift. Petitioner reported it as such on his gift tax return for the year ended December 31, 1976, but in his petition he claimed it was not a taxable transaction. Petitioner's argument in support of his position is that (1) the transfer in trust for the benefit of his wife constituted a written agreement, settling their marital rights, entered into within two years preceding their divorce, and thus was for full and adequate consideration as provided in section 2516 of the Code, and (2) the transfer in trust had the effect of discharging his obligation to support her and thus does not constitute a taxable gift, citing Rev. Rul. 68-379, 1968-2 C.B. 414 and Estate of Fabrikant v. Commissioner,39 T.C. 714 (1963). *580 Section 2501(a)(1) imposes a tax on the transfer of property by gift by an individual. The tax shall apply whether the transfer is in trust or otherwise. Section 2511(a). Where property is transferred for less than an adequate and full consideration in money or money's worth, the amount by which the value of the property transferred exceeds the value of the consideration received shall be deemed a gift. Section 2512(b). Donative intent is not necessary to qualify a transfer as a gift for gift tax purposes. Commissioner v. Wemyss,324 U.S. 303, 307 *12 (1945). A transfer made solely in discharge of a legal obligation to support a divorced wife is not a gift since the discharge of a legal obligation constitutes consideration to the donor measurable in money or money's worth. Estate of Fabrikant v. Commissioner,supra, at page 716; Rev. Rul. 68-379, 1968-2 C.B. 414. *581 Section 2516 then provided in pertinent part: Where husband and wife enter into a written agreement relative to their marital and property rights and divorce occurs within 2 years thereafter (whether or not such agreement is approved by the divorce decree), any transfers of property or interests in property made pursuant to such agreement -- (1) to either spouse in settlement of his or her marital or property rights, * * * shall be deemed to be transfers made for a full and adequate consideration in money or money's worth. Petitioner has the burden of proving that the transfer in trust was not a taxable gift. This burden is more difficult than usual to carry here because shortly after the transfer was made petitioner reported the transaction as a gift on his 1976 gift tax return, and paid tax thereon, indicating the somewhat contemporaneous assessment by petitioner of the reason for the transfer and the result thereof. Petitioner makes a technical argument, that we will not take the time to explain here, that under the law and regulations he was required to report the transfer on a gift *582 tax return for the quarter in which the transfer was made. [3] Suffice it to say that we do not believe the regulation relied on by petitioner required him to report the *13 transfer on a gift tax return for 1976 under the circumstances, when he was not contemplating a divorce proceeding and if he did not think at the time that the transfer was a taxable gift. One difficulty with this case is that the only evidence aside from the stipulation of facts and documentary exhibits attached, is the self serving, though unrefuted, testimony of petitioner. The documentary evidence and the facts and circumstances, as we can derive them from petitioner's testimony, do not in our opinion support petitioner on this issue. Petitioner's somewhat ingenious arguments, made at the trial and on brief, based as they are for the most part on esoterical assumptions, theoretical speculations, and unsubstantiated conclusions, do not stand up in the light of what was actually done and the circumstances under which it was done. We do not find that petitioner and Fern fall within the parameters of section 2516. They were husband and *583 wife but they did not enter into a written agreement relative to their marital and property rights within two years of their divorce. The written agreement relied on by petitioner is of course, the trust agreement, but Fern was not a party to the trust agreement except as a beneficiary. Petitioner testified that there was no other settlement agreement. The trust was established unilaterally by petitioner; there is not even a suggestion in the trust agreement that it was a settlement of their marital and property rights or that Fern was giving up any of her rights. In fact the trust *14 agreement authorized the trustee to distribute so much of the income and principal of the trust to Fern as it determined to be in her best interests and in exercising this descretion "The Trustee need not take into consideration other resources of my wife, it being my intention in establishing this trust to provide her with financial independence and security." Thus section 2516 does not provide petitioner with the "full and adequate consideration" he claims relieves the transaction of being considered a gift. Also there is no evidence that the parties were contemplating divorce when the *584 trust was established, except petitioner's general testimony that he discovered soon after they were married that because of Fern's alcoholic problem the marriage probably wouldn't last. But petitioner also testified that he established the trust on the advice of a psychiatrist to alleviate Fern's feeling of insecurity. This sounds more like an expectation that the marriage would continue rather than terminate. Petitioner relies on language in the divorce decree that was entered in May of 1978. The court was concerned with whether petitioner should be required to pay Fern alimony and what should be given consideration in making that decision. The decree stated "The Court is of the opinion that husband by and through the trust has provided more than alimony but has made the wife financially independent -- therefore, husband will not be *15 required to pay wife alimony." Petitioner argues that this is proof that establishment of the trust had the effect of discharging his obligation to support Fern, and thus creation of the trust did not constitute a taxable gift. It is true that establishment of the trust may have had the ultimate effect of relieving petitioner of any *585 additional obligation to pay Fern alimony [4] but that relief, provided a year and a half after the trust was established, was not consideration for the transfer in trust. The creation of the trust was not in settlement of petitioner's and Fern's property rights. The evidence indicates that petitioner continued to support Fern in and out of hospitals throughout the year 1977 and the first part of 1978 and even the divorce decree required him to pay her hospital bills previously incurred. And as we have said before, Fern did not enter into any settlement agreement relative to her property rights and gave up no rights of support. The establishment of the trust was a gratuitous act on the part of petitioner at the time it was done. The divorce decree did not say that the establishment of the trust discharged petitioner's obligation to support Fern -- the income it produced for Fern was simply a factor the judge took into consideration in determining whether petitioner should pay her alimony. *16 Petitioner relies on Estate of Fabrikant v. Commissioner,supra. *586 In that case the taxpayer continued to make monthly payments to his divorced wife after he was required to do so under a settlement agreement, and the court held that those payments were not taxable gifts. But there the payments were established in a mutual settlement agreement by the parties and were clearly in discharge of taxpayer's continuing marital obligations, and the court concluded that the payments made after the agreement expired were simply a continuation of the earlier payments required by the agreement. Here, there was no prior agreement that the trust be established or that it was established to discharge petitioner's legal obligation of support. That case does not support petitioner on this issue, although it is apposite to the second issue we discuss herein. While we realize that had petitioner had it in mind to do so when he made the transfer here under discussion he might have been able to arrange it in such a way that he could have avoided the gift tax consequences, [5] but we have no evidence that petitioner's drinking problem had anything to do with the form the transaction took. During the latter part of 1976 petitioner sold his coal business, negotiated *587 an agreement to operate Snowshoe Ski Resort, had drafted a rather complex trust for the benefit of Fern, decided what to do about Elizabeth's request, *17 and made gifts of stock to his children. There is no evidence that his mental condition would have prevented him from negotiating this transfer as being for full and adequate considerations had he intended it to be. Discharge of Elizabeth's Note
The second issue is whether petitioner's forgiveness of the balance due on Elizabeth's $125,000 note payable to petitioner constituted a taxable gift. Petitioner argues that his forgiveness of the balance due on the note was not a taxable gift because (1) petitioner received full and adequate consideration therefor, and (2) the note was worthless at the time it was discharged.Respondent argues that the dischrge of the note and debt evidenced thereby was a gratuitous transfer and that there is insufficient evidence to prove either that petitioner received consideration therefor or that the note was valueless. We agree with respondent *588 that the note was not valueless. Petitioner's alternative argument with respect to the cancellation of the $125,000 note is that it was valueless at the time of the cancellation and thus would not give rise to a gift tax. Petitioner claims that the note was valueless because Elizabeth had nothing of her own with which to pay it and the deed of trust securing the note was subordinate to the deed of trust on the property securing the $250,000 note payable to the Bank of Commerce and that the property would not sell for more than $250,000 if sold at a forced sale. *18 Petitioner had the burden of proving that the note was totally valueless because he made no claim and offered no evidence to prove that it was worth any amount between the balance due thereon and zero. In other words he does not admit that the cancellation of the note gave rise to a taxable gift of any amount. Petitioner has failed to carry his burden of proof that the note was valueless; in fact the evidence indicates that the note was probably worth the full face value thereof, or at least the unpaid balance thereon at the time it was cancelled. In the first place Elizabeth had met all the current payments *589 of principal and interest on the note as they became due, and there is nothing in the record to indicate that she could not continue to do so. Under the settlement agreement petitioner was obligated to pay her in excess of $70,000 annually; petitioner himself points out in his reply brief that the debt service on the Bank of Commerce note and the note to him would be only about one-half of the amount she was receiving annually from petitioner. Even if she had no other income or assets, payment of her obligations under the two notes would not have left Elizabeth without living expenses and something to pay on the principals of the notes. Furthermore, the balance due on the note to the Bank of Commerce assumed by Elizabeth is not in evidence. *19 In an appraisal report done at the behest of petitioner in June, 1975, the farm property containing 688 acres, and including the farm house in the completion stage of being remodeled, was valued at $370,000. This did not include the value of the personal property, including live stock, located on the farm. Elizabeth's letter implied that she had acquired additional farm equipment. Petitioner testified that he had invested $406,000 *590 in the farm property and the settlement agreement provided that petitioner would buy the property back at Elizabeth's request for $400,000. The property was located close to the Snowshoe Ski Resort and it was likely that the farm would increase in value if the ski resort was a successful operation. [6]
On the evidence in this record it would be incredible to conclude that the $125,000 note, having a balance due of approximately $117,000, was totally worthless in the latter part of 1976. Petitioner attempted to show that the note was worthless by arguing that no value was placed thereon in the settlement of his income tax liability for 1975 with respect to which he claimed a loss on the sale of the farm to Elizabeth. Such an argument is so nebulous that we refused to receive in evidence petitioner's testimony with respect to the internal settlement of his 1975 tax liability. *20 Petitioner's principal argument on this issue is that the note was cancelled in discharge of his obligation to support Elizabeth and thus was not a gift. As *591 heretofore noted, a transfer made solely in discharge of a legal obligation to support a divorced wife is not a gift since the discharge of a legal obligation constitutes consideration to the donor in money or money's worth. Estate of Fabrikant v. Commissioner,supra;Commissioner v. Mesta,123 F.2d 986 (3rd Cir. 1941). Petitioner's argument is premised on the theory that because petitioner's assets were much more valuable in December of 1976 than they were thought to be at the time the settlement agreement between Elizabeth and himself was executed and approved by the divorce court, Elizabeth had valid claim against him for modification of the property settlement agreement which she waived in exchange for the $125,000 note. The parties spend considerable time on brief discussing whether under West Virginia law a property settlement agreement which is approved by a divorce court but which was not merged in the divorce decree can subsequently be modified because of proof of changed circumstances of fraud. [7] We don't find this argument to be relevant *592 here because the argument is based on the assumption that the proposed modification was resisted by one of *21 the parties. Such is not the case here; Elizabeth asked for cancellation of the note and petitioner agreed she was entitled to it and cancelled the note. Certainly the parties to a settlement agreement can modify their agreement out of court and without approval of the divorce court if the agreement is not made a part of the divorce decree or any other order of the court. Estate of Fabrikant v. Commissioner,supra.See Corbin v. Corbin, 157 W. Va. 967, 206 S.E. 2d 898 (1974). *593 But the question remains: was the note cancelled for a consideration measurable in money or money's worth? If it was done in discharge of petitioner's obligation to support Elizabeth we think it should not be classified as a gift for gift tax purposes. Estate of Fabrikant v. Commissioner,supra;Rev. Rul. 68-379, supra.
We have no evidence of fraud on petitioner's part in obtaining the original settlement agreement. [8] But there was a change in circumstances between the time the original settlement agreement was negotiated and the time the note was cancelled. We believe both petitioner and Elizabeth and their representatives were surprised when petitioner was able to sell his coal interests on such favorable terms. They had an ongoing agreement to settle their property rights based on the value of *22 petitioner's assets known to them when the agreement was executed. When the true value of petitioner's property rights became known to Elizabeth she simply asked that her note be cancelled to make a more equitable settlement of their property rights so she could enjoy the status in life she was supposed to have been given in the settlement *594 agreement. Petitioner recognized the validity of her request and voluntarily complied therewith. But his action was for the same purpose as the original settlement -- to discharge his obligation to support Elizabeth. It is not certain whether the West Virginia divorce court would have entertained a petition to modify the settlement agreement had Elizabeth filed one. See Farley v. Farley,149 W. Va. 352, 141 S.E. 2d 63 (1965); Corbin v. Corbin,supra;ReEsate of Hereford,162 W. Va. 477, 250 S.E. 2d 45 (1978). But this was an uncertainty that, in part, motivated petitioner to agree to Elizabeth's request. Actual litigation is not required to prove that a transfer was made *595 in discharge of a legal obligation to support. Beveridge v. Commissioner,10 T.C. 915 (1948); Estate of Freidman v. Commissioner,40 T.C. 714 (1963). We have no doubt, however, that the divorce court would have approved this addition to the settlement had it been called upon to do so. We think this transaction was similar to the circumstances in Estate of Fabrikant v. Commissioner,supra, where we held that payments made by the husband to the wife *23 beyond the time he was required to make them under a settlement agreement were not gifts since payments were made under a continuing legal liability to contribute to his wife's support. We think the cancellation of the note should be treated as an addendum to the agreement of the parties settling their property rights. We recognize that petitioner could have forestalled this issue by having the settlement agreement modified in writing and signed by both parties. However, petitioner did note on both the cancelled note and the release of the deed of trust securing same that the *596 note was being cancelled to finally settle the divorce dispute between him and Elizabeth. Of course Elizabeth did not formally accept this condition but she did accept the cancelled note and the released deed of trust. We hold for petitioner on this issue and conclude that the forgiveness of the note was not a taxable gift. Decision will be entered under Rule 155.
[9]
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect at the time, unless otherwise indicated.↩
2. Presumably for the last quarter of 1976 although the quarter is not designated on the return.↩
3. Petitioner relies on Regs. 25.6019-3(b), Gift Tax Regs.↩
4. We are not prepared to say that it discharged his legal obligation to support Fern.↩
5. This is also pure speculation. We have no evidence that Fern would have agreed to relinquish her rights in consideration for the transfers.↩
6. Snowshoe was apparently quite a success as a ski resort but it suffered from inadequate invested capital and cash flow problems.↩
7. See Corbin v. Corbin, 157 W. Va. 967, 206 S.E. 2d 898↩ (1974) for a discussion of the difference between a settlement agreement that is merged into the divorce decree and one that is simply ratified, approved and confirmed by the divorce decree under West Virginia law. The latter simply leaves the parties in a contractual relationship with each other which may be modified by agreement of the parties without court approval.
8. Petitioner apparently realized that if cancellation of the note was considered to be a reduction in the sale price of the farm, it would reduce his taxable gain or increase his loss on the sale of the farm, relieve him of gift tax liability, and also relieve Elizabeth of a charge that she received taxable income on the release of her indebtedness.↩
9. This Court does not have jurisdiction to determine whether petitioner is entitled to a refund of the gift taxes he claims to have paid on Fern's behalf for the year ended 1976 as a result of their election to split the gifts made in that period. Petitioner now concedes that gift splitting was not available to them.↩